All right, now each side has 15 minutes on this and so before we start doing the clock, is it Westlake that has two people? No. Okay, maybe then I'll have you come up and just ask your question there. Okay. May it please the Court, Your Honor, I'm Jonathan Frank and my colleague Pat Rydite and I have allocated certain issues and the time of ten minutes and five, ten minutes for me and five to Mr. Rydite. Okay, so since you are the appellee, you don't have rebuttal time, right? That is correct. All right, here's the problem that sometimes comes about when you allocate time, that the person, the first person that gets up just goes crazy and then the person that's sitting down there sees that they're cutting into their time and I see them over there and they're about to having a meltdown over am I going to get my time or not. All right, at ten minutes, when your ten minutes are up, if my colleagues are asking you questions and you're answering questions to my colleagues, you still have five minutes. Okay, I won't credit it because that's, but on the other hand, if my colleagues are not asking you questions, then at ten minutes, you sit down. I understand, understood. And just to be clear for the court, I'll be handling any jurisdictional questions the court has. My colleague will be handling statute limitations and magnetar, the antitrust components of this. I'll be handling the elements of Walker process and sham litigation. All right, well, hopefully we can remember that. So, okay, so you'll get your five minutes, but one way or the other, but continue to Good morning, your honors. Tom Freeman on behalf of Westlake Services. My goal is to reserve three minutes. Three? Three. Okay. I'm going to be addressing three issues. First one, hopefully only briefly, would be the jurisdictional issue. The second issue would be the intent to deceive requirement. And finally, the materiality of omission. I'm only surmising, but I, since we said be prepared to discuss the jurisdictional issue, I'm going to say that you might be spending more than that amount of time on it, that we're interested in that. So on the jurisdictional issue, if, so we have the Federal Circuit and we have the Fifth Circuit, right? Federal courts take jurisdiction pretty darn seriously. All right? So even though no one talks about it down below, we don't, we don't automatically just jump over that and assume jurisdiction. So my understanding is that there's a case that's on the Supreme Court's calendar being considered, whether they're going to grant cert. Is there, is there any reason for us not to wait for that? Well, I mean, given the time, obviously the court's pretty sick of hearing from both of you downstairs. I can tell that from the record. I think that is evident, yes. A little further delay I don't think would hurt anybody. But by the same token, jurisdiction is pretty, is pretty important that way. Yes, it's important. And I certainly think that it's, it may be prudent to just wait for a decision as to whether it will be taken in October is fine. Although I don't think that this case presents a difficult issue. The Zentronics case, which is the case that there's a petition for. Yeah, that is a much different case. And I'll tell you why. Because in, in Gunn, basically what the Supreme Court did was they said that there's no substantial patent issue if we're really talking about a patent that is no longer live. And so that was the distinction that, that, that came up in Gunn. Now, it's also based in part upon the fact that there'd be a decision rendered by a state court, not a federal court. So any presidential value or weight would be pretty minimal. Here you are talking about a possible decision out of a sister regional circuit court. Yes. Although subject to U.S. Supreme Court review, unlike what would be going on in state court. But let me get into the issue because I see there is maybe more of an interest than, than I anticipated. The Supreme Court likes to reverse the federal circuit, too, if you haven't noticed that. Yes, I have noticed that. Okay. So first of all, there are two issues here then on jurisdiction. There's the first issue, the threshold issue, is whether the standard in Gunn, which, which did apply to the arising under patent law distinction under 1331 between state court and a federal district court. In Gunn, they applied a test and one of the requirements under that test was there needs to be a substantial patent law issue in order for to be federal jurisdiction. Now the question of whether the Gunn substantiality standard applies under 1295 has either been expressly or implicitly addressed by several other federal appellate courts. The, the third circuit, the 11th circuit, the federal circuit, of course, those, all those circuits applied the Gunn test under 1295. They, they applied the requirement that there needs to be a substantial patent law issue in order for the federal circuit to have exclusive jurisdiction. Even the Fifth Circuit, in two unpublished opinions, applied the Gunn test and in the Zentronics case, the Fifth Circuit did not hold that the Gunn test didn't apply. They did, as, as, as Judge Chen pointed out, well, he didn't point out for them, but as your question implied, they did say, well, there may be a distinction because, you know, Gunn dealt with a federal state distinction. But, you know, in the Christensen case, what the, the really the, they would have linguistic consistency and they would apply a rising under patent law the same under 1331 and in that case it was, it was section 1338. What's happened since then is, is 1295, the language was jurisdiction over cases, you know, pursuant to the arising under patent law language in 1338. They just took the arising under, under patent law language and they plucked it into 1295. But the same principle of consistency of what does arising under patent law mean would apply. And so, yes, there's a, you, you can distinguish the different contexts, but the Supreme Court has not previously been inclined to do that. And if, and, and no court has, has held that the Gunn test does not apply under, under 1295. So how do you apply, assuming that because of the linguistic consistency that 1331 equals 1338 equals 1295, what about the federal state relations? So it doesn't have a direct application to 1295. How, so what are we supposed to do with that? Well, the rest of the factors I could see, but what do you do with that? Well, I believe that the, what's, what's been done by the, I believe it was the 11th circuit and I think there are also some federal circuit cases, they don't slavishly apply the standards, the same four standards because they don't all apply. But they all apply the substantial patent question standard because that is applicable in the context. And the key determinant under the, at least for our purposes here, is that there's no substantial patent law question according to Gunn when there's no live patent. So, just, I know we're using your time, but it's our time too. Do either of my colleagues want to ask any more jurisdictional questions before he moves on to his other issues? Yes, you haven't convinced me that there's no patent question here. Just because there's no live patent. It's almost a do-over. It's a re-analysis, a reassessment of what was really, whether the original patent was valid. Well, I think, respectfully, if it were the case that the jurisdiction of regional courts outside of this was so narrow that whenever patent issues can come up, they must go to the federal circuit, you know, that's not the case. If the standard is relatively loose in your patent law, even if it is ultimately decided under patent law, a regional court, regional appellate court, still has jurisdiction. So, the constraints are not as tight as one might imagine, and applying the Gunn standard would not materially increase, would not you know, a dead case that can have no real-world impact outside of the parties. It's purely hypothetical, and that they're not concerned about that. And, in fact, the concern, I would think, would be less within the federal system as in the state system, because if there is a dispute between two different circuits on a substantial issue of patent law, then the Supreme Court can resolve that issue. And, in fact, that may be, well, I won't go further into it, but I don't think that is such a huge obstacle, and I don't think the state-federal distinction is so much more important. Okay, I'll move on to intent to deceive. So, I think that the Kaiser case from the Ninth Circuit, talking about a Ninth Circuit opinion dealing with a patent-related issue, I think that the Kaiser decision is really dispositive on the intent issue here. In Kaiser, the court said that, well, you've got the patent and trademark office has this Rule 56, and Rule 56 requires the disclosure of material information with the patent application. And, by material information, it's defined to mean information that would establish a prima facie case of unpatentability. And, in the context here, where you have commercial uses and sales and contracts, and everyone admits that that qualifies as a prima facie unpatentability situation, subject only to negation by At the time they decided to look into patent, the possibility of patenting, they had long ago, over a year prior, initiated this pilot program. And so, why didn't they bring it up? You've got a violation of the duty to disclose. Why wasn't it brought up? The most reasonable inference, and Kaiser supports this, and so does a Federal Circuit decision in the Paragon podiatry case, also supports the notion that, well, the reason you didn't bring it up is at least a reasonable inference, and the most likely inference is you didn't want to risk having your patent denied. I mean, that's the elephant in the room. There's now three elephants in this room. Is the elephant in the room materiality, more so than even the intent to deceive the PTO? Well, I'm going to get to, I'm trying to save most of my time to deal with materiality. That's a good idea. Okay, so let me jump to materiality. So, for purposes of materiality, the question, really the question is, what does it mean for an invention to work for its intended purpose? I think that's what this really comes down to. And the answer, the meaning of what is the intended purpose, and does it work for it, is, is it shown to be capable of producing the not all the results that an inventor, who may also be a business person, would like, but the claimed results. And the degree of certainty in which it is tested for experimental purposes, as opposed to commercial purposes, is to eliminate the probability of failure, not the possibility of failure. And the other sort of constraining legal concept that's quite important here is in Smith v. Griggs, the court said, the burden is on the party claiming experimental use to not only show experimental use by full, unequivocal, and convincing evidence, but also to show the time period, to delimit the time period. And in this case, of course, the testing was not done for the purpose of getting it ready for a patent, because that was not even on the drawing board at the time. The expressed purpose of the testing was to demonstrate that the product would work for CAC's particular use, which it's a big company, and it requires a big volume, and to establish that dealers will be willing to use it. Well, counsel, forgive me for interrupting, but your time is ticking, and in fairness, so you have an opportunity to respond. I read their briefing differently. I read their briefing to say that they were experimenting, experimenting, because they were getting feedback and tweaking. It seemed to me to be quite important that they were sort of tweaking the product in response to that feedback, and also that they weren't charging for it. What case law is the most comparable to that kind of a scenario? Okay, well, first, they remember that although they were not renting it out, they were making money on the 800-plus deals that were made. So there's no question there was a commercial use. I'm just, again, looking at the clock. Is there a case law that goes to this, where should I look, that's the closest that's close to your position? Beginning with Smith and Griggs, and then there's a whole line of cases, the Le Bounty case, the Atlanta case, I can't remember. It's cited in the brief, Atlanta something, where they talk about testing and work out tweaks and things like that. That is not experimental testing. That's commercial testing. I'm just looking for that in combination with not charging for it. Well, do you have a unique, well, we do cite a case in a footnote, I'll find it when I come back up, that where you're dealing with a method, it's different than when you're dealing with selling a product. Here you're dealing with a method that we are, that they are using and we are making money off of. And so that's a different situation than basically saying, hey, here's our product and use it for free. We get nothing out of this, but we want to see how you handle it. This, we are making money, they have 800, over 800 deals. And there's no way that the same amount of time could have been required to test the claim features as to test the much more complicated thing, which is their own particular business needs. Basically, you're one minute over, plus you've used your three minutes. So when you said if, when you come back, it's an if you come back. But I'm going to give you two minutes for rebuttal. All right. And if we need more time after hearing from the other side for my colleagues to have their questions answered, we'll deal with it. But you might want to, you might want to, if you had focus on that before you come back. Thank you. Okay, thanks. Good morning, Your Honors. Morning. So I'm going to start on jurisdiction, and we'll see how many questions you have on that. Then, as I indicated, I'll do the elements. Well, I think you can probably do it faster, but if you want, you've, I think the court's told you what the concerns are, so maybe you want to. I just want to address those concerns, because I think one of the fundamental distinctions on this appeal, from what I'll call the very narrow patent law focused issue that Your Honor raised, is you could decide this case on antitrust issues without ever really touching the patent law issues other than superficially. The statute of limitations is an antitrust statute of limitations. Magnetar, which is unequivocally controlling in this court, is an antitrust issue. Both of those fundamentally essentially end this case. Well, why isn't the Walker process fraud claim exclusively federal circuit? The Walker process fraud claim is part and parcel of a Sherman antitrust claim. It's the predicate for it. It is not the claim. The claim is Sherman antitrust. So tangentially, you have to establish that you get through the gate of Walker process fraud. That law is pretty much settled. What we're talking about here is application of the evidence to settle the law on Walker process fraud. Excuse me. This court has done that in Magnetar. It has done that in Kaiser. There seems no reason to walk away from that, and the federal circuit itself has not walked away from that. They endorse that. What you have is the Fifth Circuit case saying at least with respect to the live-dead comparables, we find it implausible that the Fed Circuit should not be taking that. Well, would it make sense to find out if the Supreme Court is going to grant cert? I think I would say no because I think the issue is distinct. There is the live versus dead distinction. The Fed Circuit actually took the case back and decided it based on that distinction. Correct, but they did do so. Reluctantly. It looks awfully reluctant to me, and it's pretty unusual to have a case bounce back and forth like that. The Supreme Court has got to decide this, right? I don't. Look, no one else could give the law of the land. I grant you that. But in this case, I think the precedent is there for this court to take it, and there are ample reasons not to defer. That's a different point, and I appreciate your feedback on that. Okay. So I'm going to move on to the Walker process fraud elements. I think, as I indicated before, Judge Otero and the evidence here make it clear that you're just applying the facts to settled law, and the settled law is it's not our burden to prove anything. It's Westlake's burden to prove each of those elements by clear and convincing evidence. What's the case law that's the most analogous to the fact pattern here? There are several, but I think to get to the point that you were asking about, about fees, I do recall, and I think it's TP Lab, the dentist case, where the dentist came up with a method of tying the braces together, and it had to take place, testing it over many years, and the court found that, yes, he charged his normal fees for doing the services of providing the dentistry, but he didn't charge additional fees. And that's what happened here, right? They did the deals. They earned their commissions or whatever they were selling the product. Correct. But not the software. Correct. And I think that's directly on point. Licensing fees. None. Until the first of the year. Correct. And I think that that is not only unrebutted, it's unequivocal. And, in fact, credit acceptance went back when they did become aware that maybe they could patent this, and they double-checked to make sure. This patent was deemed invalid because it wasn't patentable? Under Alice, the method was not patentable, and that's what Judge Otero found when he found that the claim initially wasn't objectively baseless. He said, look, the law has changed, and that happens, and credit acceptance accepted that and withdrew the patent infringement case. Is it accurate that I have it written down from the records somewhere, .92%, less than 1% of the active CAC dealers participated in the pilot program? That is accurate. I think it was 11 or 1,200 dealers. There were 11 pilot dealers who participated. It was restricted to them. They were selected by credit acceptance in order to ensure that they would get feedback that they deemed appropriate. Three of them, in fact, were the controlling shareholder and chairman of the board's own dealerships, and so they were very careful in who they allotted it to. The evidence is unequivocal in the record that no one else received this. Is there any dispute about tweaks or revisions to the software being made in response to that trial period? I don't think there's any dispute. The only evidence in the record is that as late as October 30th, there's a list of CAHPS issues list of roughly 300, many of which have yet to be addressed. What's CAHPS issues list? Is that like a punch list? It is actually a document in the record. I can find the page numbers for you, but it was a list. It was actually shown to their experts to say, did you even consider this? And he said, no, I didn't even know it existed. And it demonstrated that it was constantly being iterated. And, in fact, some of the issues that were still extant went directly to the claims method, in addition to determining whether this was. October of which year? October 2000. Thank you. Okay, so that's right before. Okay. Yes. And they were still on the table to be completed. And supporting that is the testimony of Brock and the evidence of Brock saying, in internal documents, saying we're not going to be ready until the end of the year. We're going to roll this out the first of the year after we have analyzed all the feedback we get. It's a little bit of a mixed bag because I think about all of the products and thinking about iPhones I've purchased that are marketed, and then there's a number of, as you know, sometimes bugs to be worked out after the fact. So I don't think it's a bright line. But it does strike me as unique in this case if they're soliciting that feedback and making tweaks and not charging for the product. And, in fact, they're not rolling it out. There are no more than the 11 dealers, even though that's 0.92%. I appreciate that. Okay. And I think another, I think, full stop block to their Walker process is subjective intent. There is zero evidence of subjective intent to defraud here. What about the quote in the newsletter about the rollout having occurred in December of 2000? Was that just a misspeak? Well, I think there's only two reasonable inferences to be drawn, and both are fatal to their claim. One is, as Brock said, yes, that's what we started to do in preparing for the rollout. That's what he testified. That's how he read it. And that's what happened. And you know that's true because the documents that show that nothing was sold to any other dealer prior to January 1st show that only the 11 pilot dealers had the program. So there was no rollout to other dealers prior to January. There were no sales to other dealers. So that's confirmed. And I do think Judge Otero's apt comment on the record when reviewing their claim that the subsequent public disclosure that said the rollout occurred in January and the pilot program had begun in August, it would belie sense if they were concealing something because why would you advertise that your pilot program had started in August and then give this whole road of potential inquiry if you were trying to hide something? Now, I think the inference is unmistakable, and they have to prove that their inference is the sole, single most reasonable, not just a possible plausible, and I'd say it's implausible inference, that it was a subjective intent to deceive. I mean you had people brought in. But on summary judgment, why is that true, that if you can draw a reasonable inference in support of the non-moving party, isn't that normally enough to deny summary judgment? It would be if you're doing a balancing, but they have to come forward with clear and convincing evidence from which a jury could find it is the single most reasonable inference to get by summary judgment. You can't on this record. If you look at their whole listing of evidence, two of their components of their evidence are you should draw adverse inferences from the appropriate invocation of the attorney-client privilege. There's a privilege log. They want you to infer from the fact that that was not disclosed, and the circuit, the federal circuit and bank has said you can't do this in patent law. They want you to draw an adverse inference to suggest that the patent attorney told them you're not going to get a patent if you disclose this. How can you do that from a proper invocation of attorney-client privilege? You can't as a matter of law. Then they want you to infer that because they then checked and found that they had not sold anything until January 9th, that because they raced to get the patent application as a matter of practicality and being pragmatic and safe about this to get it done by the end of the year because that was their understanding of the on-sale bar, that somehow we can stand that on its head almost through the looking glass where black is white and white is black and decide that somehow they must have done that because they knew that this was material but for material and they were going to intentionally deceive. I mean, there's no way. They're entitled to reasonable inferences. They're not entitled to unreasonable inferences. I see I have nine seconds. And so unless you have further questions, I will simply say there is also no basis for the sham litigation being objectively baseless or defined subjective intent. Thank you. Okay. So co-counsel has five minutes. Good morning. Good morning, Your Honors. May it please the Court, Patrick Prado for I have to leave credit acceptance. I just want to answer one question that Judge Kristen asked. The CAHPS issues list is at SCR 1205 through 1237. I have it. Thank you. Okay, great. So I wanted to address something that has yet to be addressed, which is almost surprising, and it's the statute of limitations. Westlake has alleged two different theories of this case. One is monopolization based on Walker process fraud dating back to the application and issuance of credit acceptances patent in 2001 and 2005, respectively. And the other is the sham litigation based on credit acceptances patent infringement suit in 2013. There is no dispute between the parties that unless there is some form of tolling, Westlake's Walker process fraud claim relating to the patent issuance is time-barred. That claim accrued at the latest in 2005 and expired in 2009. Westlake was required to plead a form of tolling in its complaint, and it failed to do so. This Court has noted in the Wasco products case that a plaintiff may not toll the statute of limitations based on allegations which appear for the first time in response to a summary judgment motion. This is exactly what happened here. To plead fraudulent concealment tolling, Westlake was required to plead facts showing that credit acceptance affirmatively misled it, that it was not on constructive or actual notice of its claims, and that it diligently tried to uncover the facts of its claims. Judge Otero correctly held that Westlake's allegations of fraudulent concealment fall far below the particularity required, and that's at ER 09. But under the continuing violation doctrine, doesn't CAC's lawsuit against Westlake for patent infringement qualify as an overt act that reset the statute of limitation for the Westlake Walker process claim? So the continuing violation doctrine would reset the statute of limitations for an overt act causing a new injury at that time. It's not a tolling doctrine, and that's something that is fundamentally either misunderstood or misrepresented in the briefing to this court. What the continuing violation doctrine does is it says, okay, if you have a conspiracy or an anti-competitive act outside the limitations period, and there's a new act within the limitations period, and that act causes a new injury, the plaintiff can sue for that new injury if it's in the four years before the suit is filed. It does not allow you to resuscitate a claim that expired a decade earlier, contrary to what Westlake says. But I want to address a different point. None of the acts that they refer to in their briefing on summary judgment and on this appeal, none of them, none of the advertisements, none of the patent maintenance fees that supposedly are overt acts are in the complaint, and none of them are alleged to have caused any new or accumulating injury. We don't dispute, and we haven't disputed, that the claims based on the litigation in 2013 are timely. They filed a suit two years later. But that doesn't let them buy a time machine and go back to the early 2000s and try and claim lost profits starting from when credit acceptance first obtained this patent. And that's what's fundamentally wrong with the theory that they're bringing before this court. Judge Otero correctly dismissed the majority of the Walker process fraud claims because they can't do that. But damages flowing from the 2013 suit you don't assert are off the table. Correct, and those damages, as the court held in Magnitar, are the attorney's fees that they incurred. What they can't do is take what actually with Trebling amounts to a billion dollar claim going all the way back to the early 2000s after they failed to bring suit. And not only did they fail to plead these tolling doctrines, they failed to prove them. Westlake, in opposition to summary judgment, put in 108 disputed facts. None of those disputed facts speak to any of the elements of fraudulent concealment tolling except for the mere fact of Walker process fraud. They say credit acceptance failed to disclose information to the USPTO. As this court held in Conmar when the same argument was made, we require more. A plaintiff alleging fraudulent concealment must establish that its failure to have notice of its claim was the result of affirmative conduct. There's no affirmative conduct alleged here. There's nothing in the record. And even putting that to the side, there is no evidence of due diligence whatsoever and no evidence that Westlake was not aware or on notice of its claims. And in fact, when it sued in 2015, the complaint is replete of public information that formed the basis of its claims. And even in summary judgment, it admitted that it learned through publicly available evidence and without the benefit of fact discovery on that issue that CAC had sold or offered to sell caps more than one year before it filed the 807 patent application. In other words, when it finally decided to look into this, assuming it did nothing for that decade, it was able to bring suit based on nothing more than publicly available information. Unless my colleagues have questions, your time has expired. Thank you.  All right, two minutes for rebuttal. First, getting back to Judge Kristen on the two questions, at footnote one of our reply we cited the scale tech case, which says that a sale occurs for these purposes if a method is used for a commercial purpose. I think that case is on point for that issue. In terms of the best cases to talk about the distinction between experimental and commercial testing, I noticed at page five we cite a number of the better cases for that, Tice, La Bounty, Smith and Davis. And so if there is two points that I can emphasize, because some of the question, you know, the distinction between experimental and commercial testing is not that experimental testing, when you're done with that, it's ready to be released on the market. Not at all. This is a very narrow category because it deals with the amount of time you can basically keep private your invention before you file a patent application. And the courts emphasize that. And in talking about burdens, whether it's a burden of production or a burden of proof, in Smith and Gregg, the Supreme Court emphasized that it is the holder, the patent holder's responsibility to show that the time period, to delineate the time period in which the experimental use negation applies. And in this case, they're basically just saying, look, we tested for, admittedly, for purposes dealing with our own business model and our own dealers, you know, and they're not. What about that caps list? Do you want to say something about that, the hundred and however many items? Yes, those are not, yes, it is not testing of the claimed features. They have all sorts of problems which they would have to deal with in dealing with their own system. It's a huge company, and they want to use this product for a lot of dealers. And so they did tweaks, but those are not tweaks of the claimed patent features. And that's the critical difference. And ignoring that difference would not be consistent with existing patent law. All right. Do either of my colleagues have any additional questions? I do not. No. All right, then that will conclude argument in this matter. Thank you both for your helpful argument. This matter will stand adjourned.
judges: Callahan, Christen, Chen